**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| Dominion Transmission, Inc. | ) | |
| | ) | |
|      Plaintiff, | ) | Case No. 3:13-cv-00442-JAG |
| v. | ) | |
| | ) | |
| Precision Pipeline, Inc. | ) | |
| | ) | |
|      Defendant. | ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS OR,
IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE**

Precision Pipeline, LLC, incorrectly identified as "Precision Pipeline, Inc.," hereby submits this Brief in Support of its Motion to Dismiss, or in the Alternative, Motion to Transfer Venue ("Motion").

**I.    INTRODUCTION**

This contrived lawsuit is purely the result of the Plaintiff's rush to an inconvenient courthouse in breach of a contractually-required mediation process that both parties were fully engaged in before this matter was commenced, without warning, and in a blatant effort to void the Defendant's contractual and statutory rights and remedies. As such, this matter must be promptly dismissed for lack of subject matter jurisdiction due to the Plaintiff's failure to satisfy what the Plaintiff itself characterizes as "clear contractual prerequisites to the exercise of formal legal remedies." Alternatively, this matter should be dismissed and/or transferred for being filed in a venue that has no connection with the construction work performed in West Virginia and Pennsylvania or with the disputes pending between these two *non*-Virginia domiciled parties, except for a forum selection clause that is unreasonable and unenforceable.

As set forth in greater detail below and in the supporting declarations filed concurrently herewith, the Plaintiff failed to complete the mandatory mediation process before bringing this

action.  Consequently, the Complaint should be dismissed in its entirety under Fed. R. Civ. P. 12(b)(1), and the Court need proceed no further with its analysis.

Alternatively, the Complaint should be dismissed because the natural gas pipeline construction projects in question have no relationship to the Commonwealth of Virginia.  The pipelines were constructed entirely in Pennsylvania and West Virginia, where notices are already pending and had to be filed previously in those respective state courts to preserve mechanics' lien rights.  While a contract provision purports to designate this Court as the forum for resolving the parties' disputes, that provision is unenforceable because it violates public policy indicating that construction disputes should be resolved in the state where the work is physically performed due to the unique nature of construction projects.  Lacking any other basis to properly lay venue in Virginia, this matter must be dismissed pursuant to Fed. R. Civ. P. 12(b)(3).

Similarly, given the lack of any contacts with Virginia, this matter must also be dismissed for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  Alternatively, if the Court determines that it has both subject matter and personal jurisdiction, and that the venue is proper, this case should still be transferred to a district that is convenient for the parties.

Lastly, if the Complaint is not dismissed or transferred, the Court should nevertheless exercise its discretion to dismiss Count Two pursuant to Fed. R. Civ. P. 12(b)(6).  Plaintiff's request for a declaratory ruling on its defenses to the Defendant's affirmative claims is an inappropriate (and premature) means of resolving the parties' disputes, and would not provide relevant guidance moving forward because the pipeline construction work in question has long since been completed.  Moreover, allowing the Plaintiff to proceed in its request for declaratory relief would only reward the Plaintiff for strategically manufacturing this lawsuit in an effort to unfairly exploit Defendant's reliance on Plaintiff's continuing participation in the contractual

dispute resolution process and to impede the Defendant's rights and remedies afforded by the law of the states in which the work was actually performed.

In short, this matter must be promptly dismissed for want of subject matter jurisdiction due to the Plaintiff's failure to complete the contractually-mandated alternative dispute resolution process, and the Plaintiff must be estopped from profiting by its surreptitious race to the courthouse to file a contrived declaratory action when at all times prior thereto, Plaintiff led the Defendant to believe that it was fulfilling its contractual obligation to proceed through that process in good faith.

## II.   STATEMENT OF THE CASE

This action arises from two natural gas pipeline projects that Precision Pipeline, LLC ("Precision") constructed for Dominion Transmission, Inc. ("DTI") in Pennsylvania and West Virginia (the "Pipelines").  (Decl. of Monte Pratt ("Pratt Decl.") ¶¶ 5 – 6, 9); Compl. ¶¶ 1, 2.) Construction of these Pipelines occurred in Pennsylvania and West Virginia – none of the work was performed in Virginia. (Pratt Decl. ¶ 9.)

One of the Pipelines was performed under a contract for the section of the pipeline known as "TL-590 and TL-492, Ext. 5," and the other contract involved the pipeline section known as "TL 570, Ext. 1." (Pratt Decl. ¶ 8; Compl. ¶¶ 2, 3.)  For all practical purposes related hereto, the two contracts are identical and referred to herein interchangeably as the "Contracts." The Contracts were negotiated and signed in Wisconsin and West Virginia – not in Virginia. (Pratt Decl. ¶ 7.)

Precision is a Wisconsin limited liability company with its principal place of business in Eau Claire, Wisconsin.  (Id. at ¶ 2.)  DTI is a Delaware corporation with its principal place of business in Clarksburg, West Virginia.  (Compl. ¶ 7.)  Neither of the parties is domiciled in Virginia.

The majority of the length of the Pipelines was constructed in Pennsylvania, and Precision oversaw daily operations for the Pipelines from its eastern regional office located in Pennsylvania.  (Pratt Decl. ¶¶ 9, 12.)  Most of Precision's tradespeople were hired through union halls in Pennsylvania and West Virginia, and the supervisors and managers were from Pennsylvania and West Virginia.  (Id. at ¶¶ 17 – 19.)  In addition, all of Precision's construction materials for the Pipelines were stored in warehouses and yards located in Pennsylvania and West Virginia.  (Id. at ¶ 16.)  Pre-construction activities environmental training all occurred in Pennsylvania and West Virginia.  (Id. at ¶¶ 14 – 15.)

Likewise, DTI supervised and directed the work from within Pennsylvania and West Virginia.  Upon information and belief, DTI administered both Contracts primarily from its principal place of business in Clarksburg, West Virginia.  (Id. at ¶ 20.)

Numerous changes, unanticipated site conditions, disruptions and delays significantly impacted Precision's work on the Pipelines.  (Id. at ¶¶ 22 – 23.)  Despite the difficulties encountered, Precision timely completed the Pipelines in accordance with the Contracts.  (Id. at ¶ 28.)  To do so, however, caused Precision to incur substantial additional costs, and as a result, Precision submitted more than 100 requests for additional compensation to DTI ("Change Order Requests").  (Id. at ¶ 24.)  After the Pipelines were placed into service in or about September 2012, Change Order Requests valued at approximately $80 million remained unresolved.  (Id.)

To resolve its Change Order Requests, Precision invoked the alternative dispute resolution ("ADR") process required by Article 23 of the Contracts.  (Id. at ¶ 29.)  According to Article 23, the parties were required to undertake a four-step process before any dispute over "matters concerning this Contract" would become ripe for litigation.  (See Decl. of Christopher J. Belter ("Belter Decl.") ¶ 14.)  First, Article 23.1 required the party initiating the process to

provide written notice to the other party of the existence and nature of the dispute.  (Id. at 15.)

Second, the dispute was to be referred to project-level representatives of the parties for

resolution.  (Id. at 16.)  Third, disputes not resolved by project-level representatives were to

proceed to senior officers of the parties for the exchange of written position papers and meetings.

(Id. at 17.)  Finally, the parties were required to mediate with the assistance of an independent

third-party.  (Id. at 18.)  Only if a dispute remained unresolved after attempted mediation could

the parties pursue litigation.  (Id. at 19.)

With respect to the Change Order Requests, the parties properly proceeded through the

ADR process to the third step when the parties' senior executives held a meeting on October 2,

2012.  (Pratt Decl. ¶¶ 30, 32.)  Prior to the meeting, Precision submitted a position paper to DTI,

as well as documentation supporting its Change Order Requests.  (Id. at ¶ 31.)  A settlement was

not reached during the October 2, 2012 meeting because DTI expressed a desire to further review

Precision's supporting documentation.  (Id. at ¶ 33.)  DTI's representatives indicated, however,

that they would contact Precision to schedule another executive meeting.  (Id.)  Ultimately, DTI

did not request another meeting, although several attempts by Precision to schedule one were

unsuccessful.  (Id. at ¶¶ 34.)

As Precision's attempts to advance the ADR process continued into 2013, Precision

recognized that the delay in the ADR process could unintentionally result in a waiver of its

mechanics' lien rights in both Pennsylvania and West Virginia due to time limitations in each

state requiring potential claimant's to file lien notices to preserve their rights.  (Belter Decl. ¶ 4 –

6; Pratt ¶ 44.)  With the time limitations set to expire, in February 2013, Precision attempted to

preserve its statutory lien rights and remedies by appropriately recording three mechanics' lien

notices where the Pipelines were constructed – Greene County, Pennsylvania; Marshall County,

West Virginia; and Kanawha County, West Virginia. (Belter Decl. ¶¶ 7 – 9; Pratt Decl. ¶ 44.) Notice of the filings to preserve lien rights were sent to DTI. (Belter Decl. ¶ 10.)[1]

Instead of objecting to or moving to strike the lien notices,[2] DTI requested additional supporting data for the Change Order Requests in accordance with the audit provisions of the Contracts. (Belter Decl. ¶¶ 10 – 12; Pratt Decl. ¶ 45.) DTI explicitly signaled its continuing and willing participation in the Article 23 ADR process as it characterized the document requests as being necessary "prior to proceeding to mediation." (Id. at ¶ 12; see also id. at ¶ 26.) DTI also represented that it had retained a consultant to review some of Precision's claims. (Id. at ¶ 28.) From the exchange of information and other discussions between counsel from March through June 2013, Precision was led to believe that both parties were adhering to the contractual ADR process and properly proceeding towards the mediation phase of that process. (Id. at ¶¶ 11 – 13, 20 – 34.)

Precision had complied with all of the audit requests from DTI, but Precision's counsel continued to gather and organize additional information for production to DTI to be discussed as part of the ADR process. DTI's counsel acknowledged that a meeting would be set after the exchange of information was completed, but instead, filed this lawsuit on July 11, 2013 without warning. (Id. at ¶ 35.) Without question, the ADR process was not completed and the required mediation before an independent third-party had not occurred. (Id. at ¶¶ 36 – 37.)

### III.   QUESTIONS PRESENTED FOR REVIEW

A.   Whether this action should be dismissed for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), when both parties had commenced – but not

---

[1] As set forth in greater detail in the Belter Declaration, must file foreclosure actions on August 5 and August 22 to continue to preserve its lien rights in West Virginia, but will promptly move to stay those actions consistent with its respect for the viability of the Article 23 ADR process.

[2] At the time, and contrary to its current position as set forth in the Complaint, no one on behalf of DTI asserted that the lien notices repudiated or breached the contractual ADR process. (Belter Decl. ¶ 10.) Instead, DTI always represented verbally and through its actions that it was continuing to pursue a global resolution of Precision's outstanding claims through the ADR process. (Belter Decl. ¶¶ 12, 27, 28, 29, 33.)

completed – the contractual prerequisite ADR process mandated by Article 23 of the Contracts?  [Suggested Answer:  Yes.]

B.      Whether the Court should refuse to enforce the forum selection clause in the Contracts as unreasonable and unfair, when the clause violates strong and consistent public policy interests in seeing construction disputes resolved in the jurisdiction where the work is performed, when Precision would suffer grave inconvenience to try the dispute in a forum with which it has no contacts, and when the fundamental unfairness of applying Virginia law in this context would frustrate Precision's rights and remedies under the law where the work was performed?  [Suggested Answer:  Yes.]

C.      Whether Count Two of the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted when it requests declaratory relief that will not serve any useful purpose in resolving Precision's underlying claims, and was asserted solely as a tactical maneuver to obtain perceived procedural advantages?  [Suggested Answer:  Yes.]

## IV.     ARGUMENT

### A.      The Complaint Must Be Dismissed in Its Entirety Because The Parties Did Not Complete The Mandatory ADR Process Before DTI Filed This Lawsuit

In its complaint, DTI admits that the ADR process in Article 23 of the Contracts defines "clear contractual prerequisites to the exercise of formal legal remedies." (Compl. ¶ 26.)  Yet, there is no question that DTI commenced this litigation before the parties had completed the contractually-required mediation.  Consequently, DTI cannot establish that the Court maintains subject matter jurisdiction, and the Complaint must be dismissed in its entirety.

1.      Article 23 Defines a Mandatory ADR Process That Must Conclude in Mediation Before Either Party May Commence Litigation.

Courts routinely enforce ADR agreements as a prerequisite to commencing litigation in court.  See, e.g., Tattoo Art, Inc. v. Tat Int'l, LLC, 711 F. Supp. 2d 645 (E.D. Va. 2010); Ohio Power Co. v. Dearborn Mid-West Conveyor Co., 2012 WL 2522960 (N.D. W.Va. 2012); Siarno v. Gardner Carton & Douglas, LLP, 2004 WL 838131 (E.D. Pa. 2004).  A party who resorts to litigation before satisfying the agreed-upon ADR process deprives its counterpart of a bargained-for opportunity to amicably resolve disputes before being entangled in a potentially costly legal

battle.  Tattoo Art, Inc., 711 F. Supp. 2d at 652 ("by failing to request mediation prior to filing this lawsuit, Plaintiff denied Defendants the benefit of their bargain.  As with any other contract, this Court cannot simply ignore the clear intent of the parties").  Thus, it is not surprising that courts have been unwilling to entertain cases that prematurely arrive at the courthouse before a contractual ADR process is exhausted.  **As Judge Davis recently remarked in Tattoo Art., Inc., "when parties to a lawsuit have elected not to be subject to a court's jurisdiction until some condition precedent is satisfied, such as mediation, the appropriate remedy is to dismiss the action."**  Tattoo Art., Inc., 711 F. Supp. 2d at 651.

Here, the parties agreed to an ADR process as set forth in Article 23 of the Contracts.  Article 23 directs the parties to undertake a four-step negotiation process before any dispute of "matters concerning this Contract" is ripe for litigation in court.  Notwithstanding its own belief that the Contracts' step-negotiation procedure embodies "clear contractual prerequisites to the exercise of formal legal remedies" (Compl. ¶ 26), DTI did not complete the Article 23 ADR process and specifically failed to engage in mediation before filing this lawsuit.

It is undisputed that Precision's and DTI's claims both arise out of the Contracts.  (Compl. ¶ 1.)  Yet, the ADR process is presently incomplete with respect to both parties' claims.  When this lawsuit was filed, Precision was in the process of continuing to supply supporting documentation for its claims prior to the mediation required in Article 23.  (Belter Decl. ¶ 34.)  In fact, less than one month before filing suit, DTI itself expressly invoked Article 23 to resolve its claim that Precision had not sufficiently responded to DTI's audit request.  (Id. at ¶¶ 33, 36.)  Yet, this particular dispute had not advanced beyond the first step of the ADR process (notice) before the Complaint was filed without warning.  (Id. at ¶¶ 33, 35.)  Significantly, none of DTI's other claims in the Complaint were submitted to the ADR process before filing suit.  DTI's

failure to complete the Article 23 ADR process is not an immaterial oversight.   It undermined Precision's contractual right to engage in a private negotiation that is specifically designed to prevent the need for lawsuits like this action, and represents blatant forum shopping that should not be condoned, because except for the unenforceable forum selection clause, Virginia has no connection with the parties or the construction of the Pipelines.

As the complainant, DTI bears the burden of establishing subject matter jurisdiction for its claims.  Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 769 (4th Cir. 1991).  DTI cannot do so here because it filed the lawsuit before the parties completed the contractually-mandated, condition precedent ADR process.   Accordingly, the Complaint should be dismissed in its entirety.

> 2.    The Article 23 ADR Process Was Binding and Enforceable When DTI Filed this Lawsuit

Precision's minimal efforts to preserve its *in rem* mechanics' lien rights in Pennsylvania and West Virginia to provide security in the event that DTI was later unable to meet its payment obligations did not excuse DTI's compliance with the Article 23 ADR Process.  A party's action to avoid waiver and to preserve its mechanics' lien rights is not considered a waiver or repudiation of the party's concurrent right to participate in contractually-mandated ADR.  See, e.g., Brendsel v. Winchester Constr. Co., Inc., 162 Md. App. 558, 584, 875 A.2d 789, 804-05 (Md. Ct. Spec. App. 2005) (lien claimant did not waive right to arbitration by filing a mechanics' lien petition) aff'd, 392 Md. 601, 898 A.2d 472 (2006); Saud v. Batson-Cook Co., 161 Ga. App. 219, 221, 291 S.E.2d 249, 250-51 (Ga. Ct. App. 1982) (lien claimant was entitled to protect its lien rights by filing a claim of lien and petition to foreclose the lien simultaneous with pursuing arbitration); Homestead Sav. & Loan Ass'n v. Superior Court In & For Marin County., 195 Cal. App. 2d 697, 701, 16 Cal. Rptr. 121, 123 (Cal. Ct. App. 1961) (an arbitration agreement was not

waived or repudiated by a party's filing to foreclose a lien); see also N.C. Monroe Constr. Co., Inc. v. Va. E. Co., L.L.C., CH97-141, 2002 WL 1012581 (Va. Cir. Ct. Apr. 4, 2002) ("The fact that the parties bound themselves to accept resolution of disputes by arbitration does not preclude enforcement of the mechanic's lien. . . .") (citing numerous state cases, secondary sources, and treatises for the proposition that a mechanics' lien is an enforcement mechanism that is distinct and concurrent from a right to resolve a dispute through arbitration).

In the Complaint, however, DTI avers that Precision "repudiated" the Article 23 ADR process by "initiating *legal action* before engaging in contractually-required mediation for any of its claims or disputes." (Compl. ¶ 27) (emphasis added.) To the contrary, Precision merely filed and served lien notices within the prescribed time limitation to avoid waiver and to *preserve* its lien rights so that it could *later* initiate legal action to perfect and foreclose on the liens, if necessary. (Belter Decl. ¶¶ 5 – 9; Pratt Decl. ¶ 44.)

Under both Pennsylvania and West Virginia law, contractors can enforce liens in a subsequent foreclosure action only if they have properly preserved their lien rights by filing a lien statement within the prescribed time period in the statutes. 49 P.S. § 1502; W. Va. Code § 38-2-8. Accordingly, a notice of lien simply preserves lien rights before they expire. See W. Va. Code § 38-2-8 ("For the purpose of perfecting and preserving his lien … any such general contractor … shall … cause to be recorded … a notice of such lien"). In both Pennsylvania and West Virginia, a lien claim will not come before a court unless and until the claimant files a foreclosure action to obtain judgment upon the lien claim. 49 P.S. § 1701; W. Va. Code § 38-2-26. To obtain a judgment, the lien law in both states requires the claimant to commence a lawsuit in accordance with each state's rules of civil procedure. Id.

At the time DTI filed this lawsuit, Precision had only filed notice of liens; it had *not*

sought to *pursue* any lien rights by commencing litigation.  Thus, Precision's effort to preserve lien rights did not equate to initiating "legal action," as DTI avers.  Precision's actions therefore did not repudiate or breach the ADR process in Article 23.

Moreover, Precision's filing of lien notices was not a waiver of Precision's right to insist on DTI's good faith and full participation through the conclusion of the Article 23 ADR process before filing this action.  It is well-established that a waiver generally consists of a voluntary and intentional abandonment or relinquishment of a known right.  See, e.g., Tattoo Art, Inc., 711 F. Supp. 2d at 652; Heinrich Schepers GMBH & Co., KG v. Whitaker, 280 Va. 507, 515, 702 S.E.2d 573, 577 (Va. 2010); Prime Medica Assocs. v. Valley Forge Ins. Co., 970 A.2d 1149, 1157 (Pa. Super. Ct. 2009).[3]  In particular to ADR provisions, a waiver of a dispute resolution process will only be found when a party "so substantially utilized the litigation machinery that to subsequently permit [ADR] would prejudice the party opposing enforcement of the provision." See Tattoo Art, Inc., 711 F. Supp. 2d at 652-53 (citing Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc., 380 F.3d 200, 204 (4th Cir. 2004)) (internal quotations omitted)).

The mere filing of a lien notice – and even the subsequent action to foreclose – does not constitute the use of the "litigation machinery" that would signify an intentional waiver of ADR provisions.  See, e.g., Brendsel, 162 Md. App. at 584, 875 A.2d at 804-05 (lien claimant did not waive right to arbitration by filing a mechanics' lien petition); Saud, 161 Ga. App. at 221, 291 S.E.2d at 250-51 (1982) (contractor "is entitled to protect its rights to a materialmen's lien by filing a claim of lien *and by filing a petition to foreclose said lien* at the same time it is pursuing its arbitration rights under the contract") (emphasis added); Homestead Sav. & Loan Ass'n, 195

---

[3] Based on the reasons set forth in Part B below for invalidating Article 24.2, Precision would contest any suggestion by Dominion that Virginia law is applicable if this case were to proceed.  Precision reserves all rights and challenges with respect to the applicable law in this action.  Both Virginia and Pennsylvania law are cited for the waiver doctrine because the definition is functionally the same under the law of each jurisdiction.

Cal. App. 2d at 701, 16 Cal. Rptr. at 123 (an arbitration agreement was not waived or repudiated by a party's filing to foreclose a lien); <u>N.C. Monroe Constr. Co., Inc.</u>, 2002 WL 1012581 at *3 ("The fact that the parties bound themselves to accept resolution of disputes by arbitration does not preclude enforcement of the mechanic's lien. . . .") (citing numerous state cases, secondary sources, and treatises for the proposition that a mechanics' lien is an enforcement mechanism that is distinct and concurrent from a right to resolve a dispute through arbitration).  Dispelling any notion that a notice of lien constitutes a waiver of ADR provisions, the court in <u>Brendsel</u> explained that "a contractor can pursue a mechanic's lien proceeding to make the owner's property available as a collection resource and obtain an interlocutory lien without seeking court resolution of the underlying claim." <u>Brendsel</u>, 162 Md. App. at 584, 875 A.2d at 804-05.

Consistent with the foregoing line of authority, Precision must continue to take the necessary steps required to preserve its lien rights pending dismissal of this action and the completion of the Article 23 ADR process.  While the Pennsylvania mechanics' lien law allows a claimant to preserve its lien rights for up to two years before it must initiate foreclosure (49 P.S. § 1701(b)), the West Virginia mechanics' lien law mandates that a claimant must initiate foreclosure within 6 months after filing the initial notice to avoid waiving its lien rights.[4]  <u>See</u> W. Va. Code § 38-2-14 ("The failure of any person claiming a lien…to comply substantially with all of the requirements of this article for the perfecting and preservation of such lien, within the time provided therefor…operate as a complete discharge of…all liens").  As such, Precision will timely file to foreclose in West Virginia, but immediately after filing for foreclosure, Precision will request to stay the lien foreclosure proceedings consistent with its continuing effort to avoid

---

[4] With respect to the lien notice in Marshall County, West Virginia, foreclosure must be commenced on or before August 5, 2013.  With respect to the lien notice in Kanawha County, West Virginia, foreclosure must be commenced on or before August 21, 2013.  With respect to the lien notice in Greene County, Pennsylvania, foreclosure must be commenced on or before February 5, 2015.

waiver of its lien rights but to respect the continuing viability of the Article 23 ADR process.[5] As evidenced by the line of cases cited above, this action does not constitute waiver or repudiation of Precision's concurrent right to enforce the contractual ADR process.

Nor would DTI be prejudiced by the obligation to submit its claims through the Article 23 ADR process even after Precision filed its lien notices.  Indeed, DTI actually did initiate the Article 23 ADR process less than one month before filing this lawsuit.  (Belter Decl. ¶ 33.) Obviously, Precision's filing of the notice of liens did not prevent DTI from presenting its own grievances to Precision in the contractually-required ADR process.  Additionally, DTI was not compelled to proceed in the Article 23 ADR process concurrently with litigation, as no lawsuits had yet been filed to enforce the lien rights, and to the extent Precision must initiate foreclosure to avoid waiving its lien rights due to the passage of time, Precision is also committed to staying those foreclosure actions to simultaneously preserve its right to insist on completion of the Article 23 ADR process.

Moreover, Precision's continued participation in the Article 23 ADR process after filing the lien notices evidences its intent to comply with and enforce that condition precedent to litigation.  (Belter Decl. ¶¶ 20 – 34.)  Thus, DTI cannot point to any act that would constitute an intentional relinquishment of Precision's right to insist upon exhaustion of the ADR process prior to filing this lawsuit.

**B.      Personal Jurisdiction Over Precision Cannot Be Established and Venue is Improper in the Eastern District of Virginia**

DTI alleges that this Court has personal jurisdiction over the parties solely "because the parties executed the [] Contracts in the Commonwealth of Virginia and because the parties

---

[5] Ironically, DTI's filing of a Complaint before exhausting the Article 23 ADR process is itself a total repudiation of Article 23.  As a result, Precision would be justified in not only preserving, but *pursuing* its lien rights at this point and without first participating in mediation with DTI.  As described above, however, and consistent with its actions and statements at all times, Precision is committed to completing the Article 23 ADR process.

consented to such jurisdiction under the terms of the Contracts." (Compl. ¶ 3.) The clause upon which DTI relies to allege personal jurisdiction,[6] however, should be rendered void and unenforceable because it violates the public policy of the Commonwealth of Virginia. Without the forum selection and choice of law clause, this Court does not have personal jurisdiction over Precision. Consequently, the Complaint must be dismissed.

  1. <u>The Forum Selection and Choice of Law Clause in Article 24.2 is Unenforceable</u>

Forum selection and choice of law clauses are not applied in all circumstances. <u>See</u> <u>Allen v. Lloyd's of London</u>, 94 F.3d 923, 928 (4th Cir. 1996) (citing <u>M/S Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1, 15, 92 S. Ct. 1907, 1916 (1972). Courts have guarded against overreaching forum selection clauses and choice of law provisions by rendering such provisions void if they: (i) contravene a strong public policy of the forum state; (ii) deprive a party of a remedy if the chosen law would apply; or (iii) effectively deny a party its day in court because of the grave inconvenience or unfairness of the forum. <u>See</u> <u>Allen</u>, 94 F.3d at 928; <u>see also</u> <u>The Hipage Co., Inc. v. Access2Go, Inc.</u>, 589 F. Supp. 2d 602, 612 (E.D. Va. 2008).[7] Here, Article 24.2 of the Contracts violates all three of these principles.

---

[6] Although not quoted in the Complaint, Article 24.2 provides: "This Contract shall be governed by the laws of the Commonwealth of Virginia, without giving effect to the choice of laws principles thereof, and is deemed to have been executed, entered into and performed within Richmond, Virginia. The Parties hereby irrevocably submit to jurisdiction in the Commonwealth of Virginia, and venue shall lie in the Circuit Court for the County of Chesterfield or the United States District Court for the Eastern District of Virginia, Richmond Division. The Parties hereby waive any objection to such jurisdiction and venue." The Contract itself has not been attached to this Motion because it contains a confidentiality provision. In the Complaint, however, DTI also quoted select portions of the Contracts that relate to the matters at hand. DTI has indicated that it intends to file a Motion for a Protective Order requesting permission to file the Contracts under seal or, in the alternative, dispensation of the confidentiality requirements of Article 24.4 (Compl. ¶ 10 n.1). Precision anticipates that it may consent to or join in DTI's motion so that the Court may receive full copies of the Contracts. In the meantime, like DTI, this Motion quotes only from those provisions directly relevant to the issues at hand.

[7] The U.S. Court of Appeals for the Fourth Circuit analyzes the validity of a forum selection clause under federal law rather than state law. <u>See</u> <u>Albemarle Corp. v. AstraZeneca UK Ltd.</u>, 628 F.3d 643, 650 (4th Cir. 2010) ("Following the majority rule, we thus conclude that a federal court interpreting a forum selection clause must apply federal law in doing so").

a. *Enforcement of Article 24.2 Would Contravene a Strong Virginia Public Policy that Construction Disputes Should be Resolved in the State Where the Construction Project is Located*

Virginia law embodies a strong public policy that nullifies contractual language purporting to require dispute resolution in a foreign jurisdiction when the dispute in question arises out of a construction project located in Virginia.  See Va. Code § 8.01-262.1 ("Where a party whose principal place of business in the Commonwealth enters into a contract…for the construction of…a building, structure…which is physically located in the Commonwealth… [a]ny provision in the contract mandating that such action be brought in a location outside the Commonwealth shall be unenforceable"); see also, M.C. Constr. Corp. v. Gray Co., 17 F. Supp. 2d 541, 546 (W.D. Va. 1998) ("The Virginia Code expresses a policy that disputes arising from construction contracts which are to be performed in Virginia should be resolved in Virginia").

Pennsylvania has also enacted a law substantially similar to Section 8.01-262.1 of the Virginia Code.  Section 514 of the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA"), 73 P.S. §§ 501 – 516, provides, "[m]aking a contract subject to the laws of another state or requiring that any litigation, arbitration or other dispute resolution process on the contract occur in another state, shall be unenforceable."  CASPA applies in this case because the statute defines "construction contracts" as agreements "to perform work on any real property located within this Commonwealth [of Pennsylvania]."  See 73 P.S. §§ 502, 515.

Unique characteristics of construction projects, like the Pipelines in question, reinforce the policy that construction disputes should be resolved in the state where the project is located. As a matter of logic and consistency, disputes arising out of the construction of improvements to real property should be governed by the same law that governs the real property itself.   Closely related to this principle is a contractor's mechanics' lien remedy, which provides security for payment to the contractor in the event that the owner is unable to meet its payment obligations.

15

To effectuate this remedy, lawsuits to foreclose on liens are *in rem* actions generally must be filed in the local court with jurisdiction over the property.  See, e.g., Philip L. Bruner & Patrick J. O'Connor, Jr., 3 Bruner and O'Connor on Construction Law, § 8:124.50 ("Most mechanics' lien statutes require the foreclosure action to take place in the county in which the property is located."); 49 P.S. § 1502 (a "[mechanic's lien claim] shall be effective only as to the part of the property in the county in which it has been filed."); W. Va. Code § 38-2-8 ("For the purpose of perfecting and preserving his lien, any such general contractor. . . shall. . .  cause to be recorded, in the office of the clerk of the county court of the county wherein such property is situate, a notice of such lien. . . .").

When faced with a question requiring analysis of the public policy of Virginia and another state, Virginia state courts may – as a matter of comity – apply the other state's policy if it is parallel and compatible with Virginia's own policy.  See, e.g., Kelly v. Guyon Gen. Piping, Inc., 882 F.2d 108, 112-13 (4th Cir. 1989) (holding that Virginia would apply North Carolina law as a matter of comity where the policies of both states are "parallel" and "compatible").[8] CASPA expresses a strong Pennsylvania public policy that is parallel and compatible with Virginia Code Section 8.01-262.1, and CASPA would void the forum selection clause in the Contracts.  The Pipelines in question were not constructed in Virginia, but were primarily constructed in Pennsylvania.  (Pratt Decl. ¶ 9.)  Therefore, a Virginia state court would likely apply the Pennsylvania law and void the forum selection clause in this case as a matter of comity, and Precision suggests that this Honorable Court should do the same.

---

[8] Comity derives, in part, "from moral necessity to do justice in order that justice may be done in return."  Kelly, 882 F.2d at 111.

16

b. *Application of Virginia Law Would Improperly Deprive Precision of Statutory Remedies (Interest, Penalty, Attorney's Fees) that are Available Under Pennsylvania Law*

DTI's hurry to file a specious lawsuit in this Court before completing the ADR process demonstrates that it intentionally sought to avoid defending against Precision's unresolved claims in Pennsylvania courts where Precision would enforce its lien rights and seek statutory remedies available under Pennsylvania law.  In particular, the provisions of CASPA require an award of a penalty equal to one percent (1%) per month of the sum that an owner wrongfully withholds from payment to a contractor, in additional to all other damages that are due.  73 P.S. § 512(a).  CASPA also permits recovery of interest at the rate of one percent (1%) per month on all amounts due and owing after seven days of nonpayment.  73 P.S. § 505.  Attorneys' fees and expenses also may be awarded to the substantially prevailing party in a lawsuit arising from the owner's failure to pay its contractor.  73 P.S. § 512(b).  Virginia law does not grant similar rights to contractors on private construction projects, whether performed within or outside of the Commonwealth.

Apparently, DTI concluded that if it filed suit here first, before Precision brought suit in Pennsylvania and foreclosed on its lien, this court would be more likely to enforce the choice of law clause in Article 24.2, while that clause would certainly be invalidated by a Pennsylvania court applying CASPA.  The Court must not let DTI's filing gambit and forum shopping strategy result in rulings here that may be potentially inconsistent with the state court lien foreclosure proceedings, nor let DTI wrestle away important statutory remedies that should be available to Precision in a proper forum.  DTI preemptively rushed to file suit in this Court with the intent to deprive Precision of the application of Pennsylvania law and its remedies, and with the intent to make it inconvenient for Precision to prove its case since the witnesses do not reside anywhere near Richmond, Virginia.  Condoning such behavior would be irreconcilable with the long-

standing distaste for races-to-the-courthouse motivated by forum shopping.  The Hipage Co., 589

F. Supp. 2d. at 616.

> c.   *Precision Would Be Denied an Opportunity to Fully Present Its Claims and
>       Defenses at Trial if Article 24.2 is Enforced*

Article 24.2 also should be rendered void and unenforceable because a trial in this forum,

where Precision does not have any connection, effectively will deny Precision an opportunity to

present its claims and defenses.  See James C. Greene Co. v. Great Am. E & S Ins. Co., 321 F.

Supp. 2d 717, 722 (E.D.N.C. 2004) (finding "grave inconvenience" where neither party had any

connection at all with the selected state as to either place of incorporation, principal place of

business, the relevant contract, or the performance of the contract for the claims submitted); see

also Coors Brewing Co. v. Oak Beverage, Inc., 549 F. Supp. 2d 764, 772 (E.D. Va. 2008)

(finding party "inconvenience" weighed in favor of transfer of venue from Virginia, despite a

clause selecting a Virginia forum, because the defendants were headquartered and had their

principal places of business in New York, and all of the documents and witnesses relating to the

action were located in either New York or Colorado, with none located in Virginia).

Neither the evidence nor the witnesses who participated on the Projects are located in

Virginia.  (Pratt Decl. ¶¶ 9, 12, 14 – 16, 18 – 21.)  Key witnesses who could testify regarding the

Projects from labor unions and subcontractors were hired locally in Pennsylvania and West

Virginia.   (Id. at ¶¶ 18, 21.)   Attaining participation from those individuals in a trial in

Richmond, Virginia, a city and state to which they have no discernible connection, likely will be

unfeasible.  Litigating this case in a forum where Precision will not have access to a substantial

number of potential key witnesses from the parties, as well as numerous third-parties, is precisely

the circumstance that demands voiding Article 24.2.

2.    The Court Should Dismiss the Complaint for Lack of Personal Jurisdiction

The Complaint does not support any other basis for personal jurisdiction over Precision independent of Article 24.2 of the Contracts.  Since Article 24.2 is unenforceable, the legal fiction in the clause supposedly creating Precision's connection to Virginia disappears. Accordingly, personal jurisdiction over Precision must exist, if at all, under traditional constitutional principles.  Precision's connection, or lack thereof, to Virginia cannot support a finding of personal jurisdiction in this case.  Dismissal of the Complaint is therefore warranted under Fed. R. Civ. P 12(b)(2).

a.   *Neither Specific Nor General Jurisdiction Over Precision is Present in this Forum*

To exercise personal jurisdiction over Precision, due process requires that Precision have certain minimum contacts with Virginia "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  See Int'l Shoe Co. v. Wash., 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945) (internal citations omitted).  The requisite personal jurisdiction may be either specific or general.  Specific jurisdiction exists only if the lawsuit arises from a defendant's contacts with the forum state.  Atlantech Distribution, Inc. v. Credit Gen. Ins. Co., 30 F. Supp. 2d 534, 536 (D. Md. 1998) (citing Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414, 104 S. Ct. 1868, 1877 (1984)).  General jurisdiction, on the other hand, permits a court to subject a non-resident defendant to a suit in the forum when the foreign defendant's in-state activities amount to "continuous and systematic" contact with the state.  Id. (citing Helicopteros, 466 U.S. at 414-15 104 S. Ct. at 1872).

b.   *Specific Jurisdiction Does Not Exist Because Precision Has Not Purposefully Availed Itself to the Virginia Forum*

Determining whether specific personal jurisdiction is present requires consideration of: (i) the extent to which the defendant purposefully availed itself of the privilege of conducting

activities in the state; (ii) whether the plaintiffs' claims arise out of those activities directed at the state; and (iii) whether the exercise of personal jurisdiction would be constitutionally reasonable. Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009) (internal citations omitted).

With respect to the first factor of purposeful availment, courts have considered various, nonexclusive subfactors, including:

a)  whether the defendant maintains offices or agents in the forum state,
b)  whether the defendant owns property in the forum state,
c)  whether the defendant reached into the forum state to solicit or initiate business,
d)  whether the defendant deliberately engaged in significant or long-term business activities in the forum state,
e)  whether the parties contractually agreed that the law of the forum state would govern disputes,
f)  whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship,
g)  the nature, quality and extent of the parties' communications about the business being transacted, and
h)  whether the performance of contractual duties was to occur within the forum.

Id. at 278 (internal citation omitted).

On balance, Precision simply has not sufficiently availed itself to the Commonwealth to subject it to personal jurisdiction here.  Precision does not own property or maintain any offices in Virginia.  (Pratt Decl. ¶ 11.)  Moreover, Precision has not bid on any construction projects to be performed in Virginia or engaged in any other business in Virginia.  (Id.)  Precision did not perform any of its contractual responsibilities on the Pipelines in Virginia.  (Id. at ¶ 9.)  Further, Precision's formal correspondence with DTI related to the Pipelines was directed to DTI's offices in Clarksburg, West Virginia.  (Id. at ¶ 10.)  For the same reasons, DTI cannot fairly argue that the second factor of the specific jurisdiction test – whether DTI's claims arise out of Precision's connections with Virginia – is present in this action.

Further establishing that specific personal jurisdiction is missing here, it would be constitutionally unreasonable to exercise personal jurisdiction over Precision in Virginia.  See Consulting Eng'rs Corp., 561 F.3d at 278 – 79 (considering such factors as the burden on the defendant to litigate in the forum, the interest of the forum state in adjudicating the dispute, the shared interest of the states in obtaining efficient resolution of disputes).  The same reasons why Article 24.2 is unenforceable also demonstrate that it would be unreasonable to compel Precision to litigate this case in a Virginia court.  As explained above, both Virginia and Pennsylvania public policy favoring the resolution of disputes in the state in which the construction project is located suggests that Virginia does not have any interest in this lawsuit.  In addition, Pennsylvania and West Virginia, *not* Virginia, have a vested interest in the resolution of the underlying claims in this case by virtue of the mechanics' lien remedies available where the Pipelines are located.  As such, exercising personal jurisdiction over Precision would prove constitutionally unreasonable under the circumstances.

        *c.*   *This Court Also Lacks General Jurisdiction Over Precision Because Precision Does Not Have Contacts with Virginia*

If personal jurisdiction rests on general rather than specific jurisdiction, the defendant must have significantly higher levels of "minimum contacts."  See Atlantech Distribution, Inc., 30 F. Supp. 2d at 536 (citing ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 623 (4th Cir. 1997) cert. denied, 523 U.S. 1048, 118 S. Ct. 1364 (1998)).  The Fourth Circuit disfavors a broad construction of general jurisdiction, and courts will typically only assert general jurisdiction over nonresidents "who are essentially domiciled within the forum state."  Id.  (citing Nichols v. G.D. Searle & Co., 991 F.2d 1195, 1200 (4th Cir. 1993) and quoting Corry v. CFM Majestic, Inc., 16 F. Supp. 2d 660, 663 (E.D. Va. 1998)).  As general jurisdiction is a limited vehicle for obtaining personal jurisdiction, a court may only exercise general jurisdiction over a defendant where the

defendant's in-state operation is "so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." Id. (citing Int'l Shoe, 326 U.S. at 318, 66 S. Ct. at 159 – 60).

Precision certainly does not have the necessary connection with Virginia to meet the high standard equating to being domiciled within Virginia. Precision does not have any physical presence in Virginia and does not maintain any current contacts within the Commonwealth of Virginia whatsoever. (Pratt Decl. ¶ 11.) Instead, Precision is a Wisconsin business with its principal place of business in Wisconsin. (Id. at ¶ 2.) It neither transacts nor solicits business in Virginia. (Id. at ¶ 11.) Accordingly, personal jurisdiction over Precision cannot rest on the basis of general jurisdiction.

3.      Dismissal is also Warranted Due to an Improper Venue

Once again, stripped of the legal fiction in Article 24.2 that venue can be established in this Court, DTI must demonstrate that venue is proper under 28 U.S.C. § 1391. See Douglas v. D.B. Va., LLC, 2010 WL 5572830 at *3 (E.D. Va. 2010) ("When a defendant challenges proper venue under 12(b)(3), the plaintiff bears the burden of establishing that venue is proper"). DTI, however, cannot demonstrate that any of the bases for venue under 28 U.S.C. § 1391 can be satisfied. Consequently, the Court should dismiss the Complaint. 28 U.S.C. § 1406(a). To the extent the Complaint is not dismissed as a result of improper venue, the interests of justice require transfer of the case to the U.S. District Court for the Western District of Pennsylvania where the majority of the length of the Pipelines was constructed. (Pratt Decl. ¶ 9.)

a.  There is No Basis for Venue Under 28 U.S.C. § 1391(b) in this District

28 U.S.C. § 1391(b) enumerates three possible means of establishing venue in a federal district court: (1) the defendant resides in the district of filing, (2) a substantial part of the events or omissions giving rise to the claim occurred in the district of filing, or a substantial part of

property that is the subject of the action is situated in the district of filing, or (3) the defendant would be subject to personal jurisdiction in the district of filing.   Precision's principal place of business in Wisconsin and the lack of personal jurisdiction in this forum immediately disqualify the first and the third options for laying venue in this Court.

The second option – whether events or omissions are sufficiently substantial in this district – accounts for "the entire sequence of events underlying the claim." Power Paragon, Inc. v. Precision Tech. USA, Inc., 605 F. Supp. 2d 722, 726 (E.D. Va. 2008) (quoting Mitrano v. Hawes, 377 F.3d 402, 405 (4th Cir. 2004)).   The sequence of events may include: (i) where the contract was negotiated or executed; (ii) where the contractual services were performed; and (iii) where payments occurred.   See Power Paragon, Inc., 605 F. Supp. 2d at 726.

None of the factors supporting venue in this judicial district under 28 U.S.C. § 1391(b)(2) are present here.   As previously discussed, the Contracts were negotiated and executed in Wisconsin and West Virginia and performed entirely in Pennsylvania and West Virginia.   (Pratt Decl. ¶ 7.)   Similarly, the property which is the subject of this action is not in this district or this Commonwealth.   (Id. at ¶ 9.)   As a result, DTI cannot meet its burden of showing that *any* part of the events or omissions giving rise to the claim occurred within the Eastern District of Virginia. Venue is therefore improper in this Court.

> **b.  *To the Extent the Complaint is Not Dismissed, the Case Should Be Transferred to the U.S. District Court for the Western District of Pennsylvania***

DTI's failure to lay venue in the proper district court warrants dismissal of the Complaint because this case was inappropriately commenced during the ADR process to preempt Precision from seeking monetary damages as a plaintiff once ADR was exhausted.   See Cont'l Cas. Co. v. Argentine Rep., 893 F. Supp. 2d 747, 754 (E.D. Va. 2012).   To the extent the Complaint is not dismissed as a result of improper venue, the case should be transferred for the convenience of the

parties and in the interests of justice to the U.S. District Court for the Western District of Pennsylvania under either 28 U.S.C. § 1404 or 28 U.S.C. § 1406(a).

In exercising its discretion to transfer venue, a district court must first determine whether the claims might originally have been brought in the transferee forum.  Byerson v. Equifax Info. Servs., LLC, 467 F. Supp. 2d 627, 631 (E.D. Va. 2006).  Here, this case could have been brought in the U.S. District Court for the Western District of Pennsylvania because events and omissions giving rise to the parties' disputes occurred within that venue and because so much of the Pipeline construction occurred therein.  See 28 U.S.C. § 1391(b)(2).

Several factors examined by courts in the transfer analysis weigh in favor of this case being transferred to the Western District of Pennsylvania.  See Byerson, 467 F. Supp. 2d at 631 – 32 (listing the factors courts should consider and balance).  With respect to length, the majority of the Pipeline was constructed in Pennsylvania.  (Pratt Decl. ¶ 9.)  Also, the Western District of Pennsylvania is a venue much closer to party and non-party witnesses, as well as sources of evidence relating to the parties' disputes.  (Pratt Decl. ¶¶ 14 – 18.)   Thus, it will provide the most convenient and least expensive venue for the parties, as well as a multitude of potential third-party witnesses.  Further, a Pennsylvania court has access to compulsory process because it would be able to subpoena witnesses working at the project site in Pennsylvania.   Also, both Precision and DTI have substantial contacts with Pennsylvania by virtue of their contract for construction there.  The interest in having local controversies decided at home strongly militates in favor of trying the case at the *situs* of the Pipelines.  Accordingly, to the extent the Complaint survives this Motion, this action should be transferred to the U.S. District Court for the District of Western Pennsylvania.

C.    **DTI Failed to State a Proper Claim for Declaratory Relief in Count Two**

In Count Two, DTI requests a declaration addressing the validity of, and amount due for, the contractual change requests and claims that Precision submitted to DTI for additional compensation.  Count Two should be dismissed, however, because the Court lacks subject matter jurisdiction to resolve this matter as a result of DTI's failure to complete the contractual ADR process.  Even to the extent subject matter jurisdiction exists, the Court should exercise its broad discretion to decline jurisdiction and dismiss Count Two.

1.    The Court Lacks Subject Matter Jurisdiction Over Count Two

The Declaratory Judgment Act permits federal courts to declare the rights and other legal relations of an interested party "[i]n a case of actual controversy within its jurisdiction."  28 U.S.C. § 2201.  Thus, the Declaratory Judgment Act is considered to be a procedural law providing an additional remedy for cases in which the court already has jurisdiction.  Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-672 (1950); Aetna Cas. Co. v. Quarles, 92 F.2d 321, 323 (4th Cir. 1937); Dunn Comp. Corp. v. Loudcloud, Inc., 133 F. Supp. 2d 823, 826 (E.D. Va. 2001).  In other words, a federal court may entertain a declaratory judgment action only when "the court possesses an independent basis for jurisdiction over the parties."  Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 592 (4th Cir. 2004); Dunn Comp. Corp., 133 F. Supp. 2d at 826.

As addressed more fully in Part A above, DTI cannot establish an independent basis for subject matter jurisdiction over this case because DTI failed to exhaust the contractually-mandated ADR process prior to commencing this lawsuit.  For this reason alone, Count Two should be dismissed.

2.      The Court Should Exercise Its Broad Discretion to Decline Jurisdiction Over
Count Two, to the Extent Jurisdiction is Found

Even if subject matter jurisdiction over Count Two exists, the Court should exercise its

discretionary power to decline jurisdiction and dismiss the action for declaratory judgment.

The Declaratory Judgment Act confers upon federal district courts "unique and

substantial discretion in deciding whether to declare the rights of litigants."  Wilton v. Seven

Falls Co., 515 U.S. 277, 286 (1995); see also Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co., 139

F.3d 419, 421 (4th Cir. 1998) ("This circuit has long recognized the discretion afforded to district

courts in determining whether to render declaratory relief").  With the authority to employ "great

latitude" in deciding whether to entertain declaratory judgment actions, courts should exercise

jurisdiction only when the declaratory relief sought: (i) will serve a useful purpose in clarifying

and settling the relations in issue; (ii) will terminate and afford relief from the uncertainty,

insecurity, and controversy giving rise to the proceeding; and (iii) when a declaratory judgment

action is not asserted for the purpose of "procedural fencing."  Dunn Comp. Corp. v. Loudcloud,

Inc., 133 F. Supp. 2d at 829 (citing Aetna Cas. & Sur. Co., 139 F.3d at 422).  Count Two violates

each of these principles; therefore, jurisdiction over Count Two, to the extent it exists, should not

be exercised.

a.  Declaratory Relief Will Not Serve Any Useful Purpose

Count Two fails to sufficiently allege any useful purpose for declaratory relief in

resolving Precision's claims against DTI.  Count Two simply contains threadbare, conclusory

recitals of purported reasons for declaratory relief devoid of any factual support.  Ashcrof v.

Iqbal, 556 U.S. 662, 678 (2009) ("[a] pleading that offers labels or conclusions or a formulaic

recitation of the elements of a cause of action will not do") (internal quotations omitted).

Specifically, DTI has pled only two, non-specific allegations concerning the purpose of Count

26

Two: (i) "a judicial declaration is necessary to guide the parties in the future performance of the Contracts and to facilitate close-out of the Contracts" (Compl. ¶ 58); and (ii) "[d]eclaratory relief will assist in the swift and orderly resolution of the parties' underlying contractual disagreements, quell the specter of litigation, and permit the complete close-out of the Contracts" (Compl ¶ 62).  Neither of these conclusory and formulaic averments sufficiently allege a proper, useful purpose for declaratory relief.  In reality, Count Two will not do anything except litigate the amount of Precision's damages that has already accrued.

It is not the purpose of a declaratory judgment action, however, to determine previously-accrued damages that otherwise could be resolved in a breach of contract action.   Declaratory judgments "declare rights so that parties can conform their conduct to avoid future litigation." Tapia v. U.S. Bank, N.A., 718 F. Supp. 2d 689, 695 (E.D. Va. 2010); Gregory v. FedEx Ground Package Sys., Inc., 2012 WL 2396873 *8 (E.D. Va. 2012).  This goal is undermined when the questionable conduct at issue has already occurred, claims have already matured, or damages have already accrued.  Gregory, 2012 WL 2396873 at *8; Tapia, 718 F. Supp. 2d at 695; The Hipage Co., 589 F. Supp. 2d at 615.  In essence, when a declaratory judgment cannot guide parties from breaching a contract or prevent damages from accruing, the action fails to serve a useful purpose.  See, e.g., The Hipage Co., 589 F. Supp. 2d at 615; see also Beazer Homes Corp. v. VMIF/Anden Southbridge Venture, 235 F. Supp. 2d 485, 494 (E.D. Va. 2002) ("Declaratory judgment is not an appropriate remedy for past misconduct") (internal citations omitted).

Resolution of Count Two will not provide the parties with any guidance going forward, as DTI alleges.  Indeed, there is no "future performance of the Contracts" or "close-out of the Contracts" left to perform.  (Compl. ¶ 58.)  *Almost one year ago* the Pipelines were completed. (Id. at ¶ 16.)  The losses sustained by Precision as a result of the changed work, and the damages

flowing from DTI's unjustified denial of the claims, have already accrued.  (Id. at ¶¶ 17 – 19, 21, 23.)  Since then, the parties have declared each other in breach of the Contracts.  (Id. at ¶¶ 5, 6, 28, 29, 37, 48 – 50, 52.)  All that is left to do at this time is to complete the ADR process, and if necessary, adjudicate Precision's claims and award damages for DTI's breaches.  For this reason, the declaratory relief sought in Count Two is inconsistent with the purpose of a declaratory judgment action.

Moreover, the suggestion that declaratory relief will somehow "quell the specter of litigation" is preposterous.  (Compl. ¶ 62.)  DTI *itself* not only raised the "specter" of litigation, but actually ignited litigation by filing this lawsuit.  Had DTI allowed the ADR process to proceed instead of filing this lawsuit without warning and in an effort to deprive Precision of remedies available under CASPA, it is possible the parties' disputes could have been amicably resolved without court intervention.

> b. *A Declaratory Judgment Would be an Ineffective Means of Adjudicating Precision's Claims Against DTI*

For related reasons, the judicial declaration sought in Count Two would fail to serve a useful purpose that may "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  Aetna Cas. & Sur. Co., 139 F.3d 419, 422.  DTI alleges that the Court should adjudicate the validity of Precision's claims, and the amount due and owing for those claims.  But a declaratory judgment setting forth Precision's entitlement to relief and the amount of such relief would not terminate the controversy.  The declaration that DTI seeks would not actually *award* any damages to Precision.  In addition, the outcome of litigating Count Two may produce inconsistent results with future rulings by Pennsylvania and West Virginia courts concerning the proper amounts of Precision's mechanic's liens that pre-dated this lawsuit.

Consequently, Count Two would not terminate or afford relief from the dispute between the parties.  To the contrary, a declaration from the Court that a certain sum of Precision's claims is due and owing would foster additional litigation.  See Beazer Homes Corp., 235 F. Supp. 2d. at 494 (dismissing declaratory judgment action in part because a declaration recognizing a violation of an agreement would be worthless); The Hipage Co., 589 F. Supp. 2d at 616 – 17 (concluding that judicial economy required dismissal of a declaratory judgment proceeding because it would try the case in piecemeal and another court would have to address the issue of damages).  A lien foreclosure proceeding or breach of contract action would be "more effective or appropriate under the circumstances." Aetna Cas. & Sur. Co., 92 F.2d at 325 – 26.

### c.  DTI Improperly Raced to the Courthouse to File Its Declaratory Judgment Action

The allegations in the Complaint demonstrate that DTI asserted this action for declaratory relief as a means of exacting procedural advantages and negotiating leverage in the resolution of Precision's claims.  Rather than continuing its participation in the contractual ADR process, as Precision was led to believe it would do, DTI abruptly halted progress toward a mediated settlement by surreptitiously filing this action.  Such behavior is antithetical to the purpose of the Declaratory Judgment Act and should not be condoned by allowing Count Two to proceed.

Indeed, an action for declaratory judgment cannot be used for procedural posturing or as "a prize to the winner of a race to the courthouses." Aetna Cas. & Sur. Co., 139 F.3d at 421; The Hipage Co., 589 F. Supp. 2d. at 615; Dunn Comp. Corp., 133 F. Supp. 2d at 829.  In addition, a declaratory judgment action contravenes the purpose of the Declaratory Judgment Act if it is initiated before exhausting other avenues for amicably resolving the dispute.  Dunn Comp. Corp., 133 F. Supp. 2d at 829 – 30.  As the court in Dunn Comp. Corp. succinctly stated, "district courts should not exercise their discretionary declaratory judgment jurisdiction in ways

29

that encourage races to the courthouse and discourage settlement." <u>Dunn Comp. Corp.</u>, 133 F. Supp. 2d at 830.

DTI's filing of this declaratory judgment action exhibits all of the hallmarks of a rush to the courthouse for procedural advantage. It bears repeating here that the claims underlying DTI's request for declaratory relief belong to Precision, not DTI. Precision faithfully pursued the parties' agreed-upon ADR process. While the contractual ADR was progressing, DTI seized upon Precision's fidelity to the settlement process by unceremoniously running to the court to seek declaratory relief as a plaintiff with respect to Precision's claims. The urgency to file was obviously motivated by a desire to avoid a money judgment in a breach of contract action that potentially would follow if ADR was unsuccessful, and to avoid the potential application of Pennsylvania law, including the remedies available through CASPA. This is precisely the type of procedural posturing and hasty use of the declaratory judgment remedy that the Court's discretion is designed to eliminate.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Precision respectfully requests that its Motion be granted.

DATE: August 5, 2013

Respectfully Submitted,

*/s/ Kevin J. McKeon*
Kevin J. McKeon (VSB No. 49024)
Sarah K. Simmons (VSB No. 79059)
WATT, TIEDER, HOFFAR, & FITZGERALD, L.L.P.
8405 Greensboro Drive, Suite 100
McLean, VA 22102
Telephone: 703-749-1000
Facsimile: 703-893-8029
*kmckeon@wthf.com*
*ssimmons@wthf.com*
*Counsel for Defendant Precision Pipeline, LLC*