UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

DOMINION TRANSMISSION, INC.,

    Plaintiff.

v.

PRECISION PIPELINE, INC.,

    Defendant,

**DECLARATION OF MONTE PRATT**

No: 3:13-CV-00442-JAG

I, Monte Pratt, hereby declare as follows:

### Background and Location of Work

1. I am the Vice President of the Eastern Division of Precision Pipeline, LLC ("Precision"), incorrectly identified in this case as "Precision Pipeline, Inc."

2. Precision is a Wisconsin limited liability company with its principal place of business of 3314 56th Street, Eau Claire, Wisconsin 54703.

3. Precision performs all aspects of pipeline construction and provides transmission, distribution, maintenance, and pipeline drying services, integrity and hydrostatic testing, and horizontal directional drilling, among other services.

4. I am responsible for developing and executing plans for oil and gas pipeline projects for Precision.

5. I was generally responsible for managing the natural gas pipeline projects in Pennsylvania and West Virginia at issue in this case ("Pipelines").

6. The Pipelines were pursued under two construction contracts made between Precision and Dominion Transmission, Inc. ("DTI") and executed on or about January 7, 2011 ("Contracts").

7. The Contracts were negotiated and signed in Wisconsin and West Virginia, respectively, but not in Virginia.

8. Pursuant to the Contracts, Precision was responsible for the construction and testing of pipelines known as TL-590, TL-570, and TL-492. Precision furnished the labor, materials (except for pipe, valves, and fittings), and equipment to perform this work.

9. The work related to these Pipelines occurred entirely within Pennsylvania and West Virginia, and not at all within Virginia. The majority of the length of the Pipelines was constructed in Pennsylvania.

10. Pursuant to the Contracts, all of Precision's formal correspondence was address to DTI at its principal place of business of 445 West Main Street, Clarksburg, West Virginia 26301, and all of DTI's formal correspondence to Precision was addressed and sent to Precision's principal place of business of 3314 56th Street, Eau Claire, Wisconsin 54703.

11. Precision has never done business in Virginia and has never owned or leased any property in Virginia. Precision has not bid on construction projects in Virginia, and is not presently bidding on construction projects in Virginia.

12. Precision performed its work under the Contracts out of its Eastern Regional office located in Waynesburg, Pennsylvania, and through field offices/warehouses in Waynesburg, Pennsylvania, Moundsville, West Virginia, and Belle, West Virginia.

13. The location of the work for the Pipelines was Greene County, Pennsylvania, Marshall County, West Virginia, and Kanawha County, West Virginia.

14. Pre-construction testing activities were performed at DTI facilities in Oakford, Pennsylvania and Weston, West Virginia.

15. Environmental training was conducted in Waynesburg, Pennsylvania and Belle, West Virginia.

16. Materials for the Pipelines, such as pipe, valves, and fittings, were stored at warehouses and yards in Duquesne, Pennsylvania, Vandergrift, Pennsylvania, Waynesburg, Pennsylvania, Moundsville, West Virginia, and Belle, West Virginia.

### Location of Employees, Managers, and Subcontractors

17. Construction of the Pipelines commenced in August 2011. To facilitate the construction of the Pipelines, Precision hired hundreds of individuals, bought materials, used equipment, and retained subcontractors to handle certain aspects of the work.

18. With respect to the various trade laborers Precision employed to construct the Pipelines, about half of these individual were regular Precision employees who temporarily relocated or traveled to Pennsylvania or West Virginia, and the other half were hired through trade union halls located in Pennsylvania or West Virginia. These individuals were assigned to various crews to perform different kinds of work. The crews included supervision, maintenance, environmental, ditch, stringing, right of way, bending, pipegang, fire line, coating, lower in, utility, and tie in.

19. Precision's supervisors and managers included numerous individuals from both Pennsylvania and West Virginia, including the following:

   a. Hubert Ross, a superintendent from Wind Ridge, Pennsylvania,

   b. Robert Beirne, a warehouse and purchasing foreman from Clendenin, West Virginia,

c. Ronald Geho, a foreman from New Martinsville, West Virginia,

d. Richard Morgan, a foreman from Fairmont, West Virginia,

e. John McCollum, a foreman from Sycamore, Pennsylvania,

f. Stephen Dobbs, a foreman from Glen Easton, Pennsylvania,

g. Derek Engle, an engineer from Barboursville, West Virginia,

h. Corey White, a straw boss[1] from Wheeling, West Virginia,

i. David Weaver, a foreman from New Freeport, Pennsylvania,

j. Cheyenne Wade, a foreman from Shunk, Pennsylvania,

k. Jason Fye, a warehouseman from McVeytown, Pennsylvania,

l. Shawn Fye, a warehouse and purchasing foreman from Lewistown, Pennsylvania,

m. Michael Basinger, a straw boss from Waynesburg, Pennsylvania,

n. Leroy Streich, a safety foreman from Warren, Pennsylvania,

o. Mark Frye, an environmental foreman from Cameron, West Virginia,

p. Richard Bradley, a straw boss from Huntington, West Virginia,

q. Brian Fetter, a straw boss from Osterbury, Pennsylvania,

r. Charles Soles, a foreman from New Freeport, Pennsylvania,

s. Edward Fox, a straw boss from Cameron, West Virginia,

t. Adam Butchko, a straw boss from Dunbar, Pennsylvania,

u. Edward Silcox, a straw boss from Cameron, West Virginia,

v. Randall Tedrow, a straw boss from Cameron, West Virginia,

w. Nicholas Jones, a straw boss from Cameron, West Virginia,

x. Sean Smith, a foreman from Trout Run, Pennsylvania,

---

[1] A straw boss is an assistant to a foreman in charge of supervising and expediting the work of a small group of workers.

y. Matt Holley, a superintendent from Elkview, West Virginia,

z. John Snyder, a foreman from Sandyville, West Virginia,

aa. Kevin Blumer, a straw boss from Holbrook, West Virginia,

bb. Travis Shafer, a foreman from Amma, West Virginia,

cc. Charles McKown, a foreman from Arnoldsburg, West Virginia,

dd. Joseph Manns, a straw boss from Chloe, West Virginia,

ee. Zachary Taylor, a straw boss from Elkview, West Virginia,

ff. Jeffery Schreckengost, a foreman from Spencer, West Virginia,

gg. Jamie Burch, a foreman from Millstone, West Virginia,

hh. Jeffrey Church, a foreman from Orma, West Virginia,

ii. Brandon Cottrell, a foreman from Orma, West Virginia,

jj. Daniel Lyons II, a foreman from Clendenin, West Virginia,

kk. Jonathon Lytle, a superintendent from Frametown, West Virginia,

ll. Richard Perkins, a foreman from Chloe, West Virginia,

mm. Joel Parsons, a straw boss from Spencer, West Virginia,

nn. Richard Bradley Jr., a straw boss from Huntington, West Virginia,

oo. Derek Engle, an engineer from Barboursville, West Virginia,

pp. Jeremy Calvert, a foreman from Left Hand, West Virginia,

qq. Gary Craig, a foreman from McVeytown, Pennsylvania

rr. Jimmy Dyer Sr., a straw boss from Belle, West Virginia,

ss. Ronald Mowrey, a straw boss from Arnoldsburg, West Virginia,

tt. Gordon Mulholland, a foreman from Charleston, West Virginia,

uu. Dwayne Boggs, a foreman from Newton, West Virginia,

vv. Scott Palmer, a foreman from Brockway, Pennsylvania,

ww. Samuel Tanner, a straw boss from Frametown, West Virginia,

xx. Joseph Bevel, a foreman from Clendenin, West Virginia,

yy. Michael Lartz, a foreman from Nicholson, Pennsylvania,

zz. Kenneth Stier, a straw boss from Spencer, West Virginia,

aaa. Franklin Wolfe, a straw boss from Walton, West Virginia, and

bbb. Justin Woods, a straw boss from Clendenin, West Virginia.

20. Upon information and belief, DTI's management team involved in the Pipelines primarily worked out of DTI's Clarksburg, West Virginia office, both at the time the Pipelines were being built and at the present. These individuals were all involved in change order discussions, which are discussed further below. The individuals included the following:

a. John M. Love, the former Vice President of Engineering and Plant Operations,

b. Donald Baumann, the former Director of Engineering Services and Pipeline Integrity,

c. David Mordan, the Director of Engineering,

d. Carole McCoy, the Engineering Services Manager,

e. Brittany Moody, a Project Manager, who was involved in the TL-590 and TL-492 Pipelines since construction started on them,

f. Greg Park, a Construction Supervisor, who was involved in the TL-590 and TL-492 Pipelines since construction started on them,

g. Scott Terneus, a Project Manager, who was involved in the TL-570 Pipeline, but departed from DTI in 2012 during construction, and

    h. Randal Swiger, a Construction Supervisor, who was involved in the TL-570 Pipeline since construction started on it.

21.    Precision hired subcontractors out of Pennsylvania or West Virginia to perform certain work related to the construction of the Pipelines including the following:

    a. Right of Way Clearing provided clearing services and is based out of Greensburg, Pennsylvania,

    b. Ten Mile Paving provided asphalt paving services and is based out of Washington, Pennsylvania,

    c. Lindy Paving provided asphalt paving services and is based out of Washington, Pennsylvania,

    d. Knight's Farm Supply furnished seed, lime, and fertilizer and is based out of Cameron, West Virginia,

    e. 84 Lumber provided materials and supplies and is based out of Waynesburg, Pennsylvania,

    f. Express Car and Truck Rental supplied pickup trucks and is based out of Warminster, Pennsylvania,

    g. Laurel Aggregates supplied rock and stone and is based out of Morgantown, West Virginia,

    h. Perry Stone Supply supplied rock and stone and is based out of Connellsville, Pennsylvania,

    i. B&M Oil Company provided gasoline and diesel fuel and is based out of Whitesville, West Virginia,

j. Marsico Brothers provided concrete and slurry products and is based out of Belle, West Virginia, and

k. Chamblin Stone provided stone and is based out of Charleston, West Virginia.

**Issues Encountered During the Work and Resulting Change Orders**

22. During the course of constructing the Pipelines, Precision faced numerous issues, especially those related to the fact that the Pipelines were being built through mountainous terrain.

23. These issues included, for example, the following: (1) mudslides and earthen slips, (2) mistakes made by parties other than Precision and its subcontractors causing delay, (3) unanticipated instances where the Pipelines would have to cross other lines (such as gas and water lines), (4) environmental regulatory issues causing delay, (5) demands by landowners through whose land the Pipelines would cross, and (6) demands made by governmental entities. These issues were encountered entirely within Pennsylvania and West Virginia.

24. Precision submitted over 100 change orders to DTI reflecting the extra work and costs necessary to complete the Pipelines on schedule. DTI has either denied or not otherwise approved of the vast majority of these change orders. The disputed or pending change orders total over $80 million. All of the extra work associated with these change orders occurred in either Pennsylvania or West Virginia.

25. In addition to directing its employees to conduct the extra work related to the change orders, Precision interacted with other third-parties. DTI interacted with some of these third-parties as well, the vast majority of which are either based in or hired employees from Pennsylvania or West Virginia.

26. As mentioned above, these third-parties include landowners through whose land the pipelines crossed and regulators. For example, with respect to change order 69 for Pipeline TL-590, Precision incurred additional labor and equipment costs associated with delays resulting from problems faced by DTI in obtaining landowner consent and regulatory approval for the rerouting of Pipeline TL-590. The reroute was necessary to avoid a large earthen slip. Upon information and belief, the landowners and regulators associated with this extra work reside in West Virginia.

27. As also mentioned above, these third-parties include subcontractors that performed certain aspects of the extra work. For example, with respect to change order 98 for Pipeline TL-590, Precision incurred additional subcontractor costs to haul screened rock to satisfy a Federal Energy Regulatory Commission ("FERC") requirement. Precision hired subcontractor Perry Stone Supply to haul the rock. As mentioned above, Perry Stone Supply's principal place of business is in Connellsville, Pennsylvania.

28. Even though there were unresolved issues regarding the change orders, the Pipelines were placed into service timely and as-planned in or about September 2012.

## Formal Attempts to Resolve the Issues

29. Besides informal attempts to resolve the issues encountered during construction of the Pipelines, the parties used the alternative dispute resolution ("ADR") process defined in Article 23 of the Contracts. In fact, the parties successfully utilized the ADR process to resolve certain disputes.

30. With respect to the disputed or pending change orders that were submitted by Precision to DTI from the commencement of work in late August 2011 through the time the Pipelines were placed into service in or about September 2012, senior officers from both

Precision and DTI agreed to hold a meeting to resolve them. This meeting was held pursuant to Article 23 of the Contracts, which called for a meeting of senior officers from both Precision and DTI ("Administrative Committee Procedure") and a subsequent mediation, if necessary, before either party would commence litigation.

31. In anticipation of this Administrative Committee Procedure meeting, Precision provided DTI with a written statement of its position pursuant to the Article 23 ADR process, in addition to other documents supporting its change orders. Despite the fact that I requested a position paper from DTI, it did not deliver such a position statement to Precision either before, during or after the meeting.

32. The Administrative Committee Procedure meeting was held on October 2, 2012 in Richmond, Virginia. In attendance on behalf of Precision were Bob Apple, Brent Sherfey, Steve Rooney, Bobby Poteete, and myself. DTI representatives in attendance were John Love and Diane Leopold, and Dave Mordan, Carole McCoy, and Brittany Moody attended via teleconference.

33. At the October 2 Administrative Committee Procedure meeting, the parties discussed Precision's position statement and the change order documents. The parties were not, however, able to resolve the issues, in part, because DTI representatives expressed a desire to spend additional time reviewing the documents provided by Precision. At the conclusion of the meeting, DTI representatives said that they would be in contact with Precision to schedule another such meeting.

34. Following the October 2 meeting, I had telephone calls with DTI representatives to schedule the next meeting, but they always said that they would get back to us to set a date. Despite their representations, they never agreed to schedule another such meeting. For example,

I had a telephone call with Dave Mordan in early November 2012 about issues with respect to the TL-570 Pipeline and to schedule an Administrative Committee Procedure meeting to discuss them. Mr. Mordan stated that he would get back to me, but he never did.

35. In addition to the attempts to resolve the issues concerning the change orders described above, Precision also tried to formally resolve issues through the Article 23 ADR process with DTI for which Precision had not yet issued change orders at the time the Pipelines went into service.

36. For example, after unsuccessful attempts to resolve an issue concerning a discrepancy between Precision and DTI over the amount or footage of rock ditch excavation and blasting, I invoked the Article 23 ADR process.

37. In particular, on September 11, 2012, I sent an email to Carole McCoy of DTI, invoking the Article 23 ADR process by providing DTI formal notice of the rock ditch dispute. I wrote that Precision sought "resolution in accordance with Article 23, and more specifically Article 23.1.1."

38. After not receiving a response from DTI to my request to pursue resolution through the Article 23 ADR process, on September 24, 2012, I sent another email to Ms. McCoy. In this email, I specifically requested that the dispute be elevated to an Administrative Committee Procedure meeting as a further step in the Article 23 ADR process. I also provided documentation supporting Precision's position with respect to the rock ditch dispute.

39. Following the October 2 meeting described above to resolve disputed or pending change orders, I emailed Ms. McCoy again, on October 10, 2012, further invoking the Article 23 ADR process. I noted Precision's formal written notice of the rock ditch dispute and asked whether DTI intended to comply with the Article 23 ADR process.

40. Because I did not receive a response from Ms. McCoy, I sent another email to her on October 30, 2012, asking whether DTI intended to respond at all.

41. Ms. McCoy responded via email on November 5, 2012, writing that she understood that this issue was "part of a global settlement agreement that John Love is currently negotiating with Steve Rooney."

42. Based upon Ms. McCoy's response, it was my belief and understanding that the Article 23 ADR process was proceeding forward and future negotiations would cover all unresolved issues.

43. Following this email, Precision continued to ask DTI to meet to resolve the issues, but our requests for such meetings were not answered.

44. In the meantime, we recognized that the passage of time could eliminate our mechanics' lien rights, so our attorneys proceeded to file and serve the documents necessary to preserve those rights in both Pennsylvania and West Virginia in case DTI would later be unable to meet its payment obligations.

45. Shortly thereafter, our attorneys received notice that DTI wished to conduct an audit, and we fully cooperated in that process with the continuing understanding that the parties would ultimately conduct and participate in the mediation required by the Article 23 ADR process in good faith.

46. Instead, DTI commenced this lawsuit without any warning and despite the parties' mutual and continuing participation in the Article 23 ADR process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on: August 5, 2013

_____
Monte Pratt
Eastern Division Vice President,
Precision Pipeline, LLC